**UNITED STATES DISTRICT COURT**

**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| UNITED STATES OF AMERICA | : CASE NUMBER 3:25CR0030 (SVN) |
| vs. | : |
| ADAM IZA | : AUGUST 13, 2026 |

**DEFENDANT'S SENTENCING MEMORANDUM**

## I. INTRODUCTION

As the Charles Dickens novel, Oliver Twist, illustrates, a child reared amid neglect, hunger, and exploitation learns survival codes that can distort judgment long after boyhood. Counsel submits that Adam Iza's upbringing, marked by parental apathy, war-torn conflict and poverty, caregiver addiction, and physical neglect and abuse, taught him to prioritize immediate safety and survival instinct over conducting himself under lawful norms, which sadly has carried over into adulthood. These adaptations do not excuse his conduct in the underlying case, but they help explain how a vulnerable child grew to become a young adult whose choices reflect lessons learned in hardship rather than malice. He is a young man with tremendous intellect and potential, who should not be locked away for decades. A sentence that considers this background can most effectively promote accountability and rehabilitation.

On June 1, 2026, Adam Iza pleaded guilty to Count One of the Superseding Indictment charging him with Conspiracy to Commit Hobbs Act Robbery, in violation of Title 18 U.S.C. §1951(a). In accordance with Rule 32(o) of the Local Rules of Criminal Procedure the defendant respectfully submits this memorandum in support of his request for

1

a variance or non-guideline sentence.  Counsel respectfully submits that Adam Iza's history and character, including his difficult childhood, lack of prior criminal history, and his limited role in the offense, when compared to the conduct of codefendants James Schwab, Angel Borrero, Reynaldo Diaz and the other Florida participants, warrants a much lower sentence. Such a sentence would satisfy the Court's mandate to impose a sentence that should be "sufficient, but not greater than necessary" to fulfill the purposes of sentencing.  <u>See</u> U.S.C. §3553(a).

## II.  SENTENCING GUIDELINES

In calculating the guidelines, the parties agree that the base offense level for a Hobbs Act Robbery is 20, pursuant to U.S.S.G. §2B3.1(a).  However, the parties have different views of the case and Adam Iza's involvement and participation in the events of August 21, 2024 to August 25, 2024.  The government believes Mr. Iza was instrumental in orchestrating the kidnapping that occurred on August 25, 2024 and that his role in the offense involved providing logistical support and direction to the kidnappers from a remote location.  It appears from the PSR, the probation officer agrees with the government's summary of facts.  <u>See</u> PSR ¶¶ 53-88.  Although Mr. Iza takes full responsibility for his role in the attempted robbery that occurred between August 21, 2024 and August 23, 2024, he submits his involvement ended once the St. Louis group departed Connecticut.

Accordingly, he does not agree with the enhancements the government and probation seek to apply to the base offense level, which are all related to the kidnapping aspect of the case occurring on August 25, 2024, after the St. Louis group had departed. These enhancements include; Use of a Dangerous Weapon (§2B3.1(b)(2)(D)); Serious Bodily Injury Suffered by a Victim (§2B3.1(b)(3)); Abduction (§2B3.1(b)(4)(A));

2

Carjacking (§2B3.1(b)(5)); and Role (§2B3.1(b)(5)).  To better understand Mr. Iza's reasons for why the enhancements don't apply here, it's important to first examine the nature and circumstances of the offense.

### A.  Nature and Circumstances of the Offense

The government and defense have differing perspectives on Mr. Iza's participation in the overall conspiracy of this offense, which can be broken down into two distinct events – (1) the St. Louis group's attempted robbery of Veer Chetal, occurring between August 21, 2024 and August 23, 2024, and (2) the kidnapping of Veer Chetal's parents that occurred on August 25, 2024.  Mr. Iza takes full responsibility for his limited role in the attempted robbery offense and doesn't dispute the substantive facts pertaining to said crime.  He also doesn't dispute the underlying facts of the kidnapping that occurred on August 25, 2024. However, Mr. Iza submits he played <u>no</u> part in the kidnapping facet of the conspiracy.

### 1.  <u>Veer Chetal's Heist of $245 Million Bitcoin</u>

The case basically started in March of 2024 when Veer Chetal and his associates committed multiple cryptocurrency heists and were spending their ill-gotten gains at nightclubs around the country and living lavishly.  As set forth in the Washington DC Indictment, 3:24CR00417(CKK), Chetal and his group carried out the following thefts (<u>See</u> **Exhibit A**-Overt Acts at ¶ 37.):

      a. $600,000 from Victim #1 on March 13, 2024

      b. $2,900,000 from Victim #2 on May 15, 2024

      c. $870,000 from victim #3 on June 23, 2024

      d. $1,740,000 from Victim #5 on July 21, 2024

      e. $14,000,000 from Victim #6 on July 24, 2024

Then on Auguust 19, 2024 he and his group orchestrated an elaborate online scheme to steal 4,100 Bitcoin, valued at approximately $245 million, from a Washington, D.C. resident. It was the $245 million heist that finally brought Chetal notoriety. The self-taught hackers used social-engineering tactics where they would call potential victims and trick them into providing passwords, pins, and other personal information that the scammers would then use to gain unauthorized access to the victims' private accounts. Once the hackers gained access to the crypto wallets, they'd transfer the funds and splurge on luxury cars, jewelry, expensive rental properties, nightclub parties, and payments to off-duty law enforcement officers who provided confidential information and occasional muscle when needed. (See **Exhibit A**, p. 21, section vv. – "Between August 19, 2024 and September 10, 2024, Lam and his associates spent over $4,000,000 in stolen virtual currency at Los Angeles nightclubs").

    2. <u>Veer Chetal Encounters James Schwab in Florida</u>

The conspiracy started on or about July 5, 2024 when Chetal encountered co-defendant James Schwab at a Miami nightclub. Schwab and his associates, including Daniil Benzid (a.k.a. 'Judah'), Cam Cureton (a.k.a. 'CAM, and 'CX'), and others were socializing in South Florida, and were familiar with Chetal because they moved in the same circle of online scammers. At some point in the evening a heated argument erupted between Schwab and Chetal which escalated into a physical altercation in front of numerous witnesses. Social-media posts after the incident embarrassed Schwab. He subsequently reported in a group chat with Judah and another roommate that his group was "beefing so hard with them". (See PSR at ¶18). The argument was deemed very serious to Schwab because he sought violent retaliation against Chetal. While still at the club Schwab contacted an associate, Reynaldo Diaz, and instructed him to shoot Chetal and his associates, and further provided

4

Diaz with the Airbnb address where Chetal and his group were staying. Schwab messaged Diaz, "But I want them outside – not just shooting the house". (Id.). Diaz then responded that he needed to know when Chetal and his group left the club so "we can be on point" and assured Schwab that "gun situation" is locked in. (Id.). Schwab responded to Diaz, "need this – it got physical". (Id.). Later, after Chetal apparently apologized to Schwab, Diaz was instructed to abandon the hit on Chetal's life but instead, Schwab directed him to rob Chetal of the stolen Bitcoin. Schwab noted in the communication that he "wanted to get them in LA a while back". (Id. at ¶ 19). However, the robbery was never carried out.

Weeks later, Iza, another prominent figure in the small crypto community, learned of Schwab's conflict with Chetal from Schwab's roommate, Remington Ogletree. Iza was aware of Schwab's reputation but was not close to him. In fact, Iza and Schwab were at odds with each other because Schwab had reported him to someone at Meta about a scam Iza had been involved in.[1] Up until this point, Iza was not aware of Chetal, and only learned of him through Ogletree who described Chetal in messages as a "Coinbase social engineer kid that is egoing people and making them angry". (Id. at ¶ 22). Ogletree further informed Iza that Chetal was "going to get pulled out of a car in traffic and shoved into a diff one if he cant be reached at his house". (Id.). When alerted of this hostility towards Chetal, Iza responded, "I'm guessing this is coming from James [Schwab]". (Id.).

---

[1] Schwab had reported to authorities that Iza had stolen from Meta (FaceBook) by accessing a Meta employee's account and converting lines of credit for advertising to his own customers, billing them millions of dollars for the service. This offense is one of the charges he pleaded guilty to in the Central District of California.

3. <u>James Schwab's Reputation as a Thief and Con-Man</u>

James Schwab is a young man who has a history of engaging in various fraud schemes to generate money, including check fraud, SIM swapping, and social engineering scams.  In fact, he has never had a legitimate job and relies exclusively on criminal activity for funds. (<u>See</u> [Doc. entry 1-1] at p. 4; ¶ 9 – Affidavit in Support of the Criminal Complaint against James Schwab, filed 1-27-25.  He and co-defendant Reynaldo Diaz lived together in Miami for a period in 2022.  Schwab also lived in several other exclusive residences across the United States, including Miami, Vegas and Los Angeles.  He communicated with his associates via Telegram and FaceTime to impede law enforcement from locating evidence of his criminal activity.

4. <u>The Robbery Plot with the St. Louis Group</u>

Following the embarrassing Miami incident, Schwab devised a plan to send a group to Danbury, Connecticut, where Chetal lived with his parents, to get retribution and rob him of the stolen Bitcoin.  The idea was to enter the home, threaten Chetal, and force him to transfer the crypto funds.  To further this plan Schwab recruited Saife Faiq, the brother of Adam Iza, whom he had met in Los Angeles while Faiq visited his brother.  On August 13, 2024 Schwab attended a birthday party at Iza's home in Orange County, California and informed Iza that he contacted Faiq to help him retaliate against Chetal.  Upon hearing this, Iza opposed the plan of recruiting his brother and got into a heated physical argument with Schwab, repeatedly hitting and punching him.  Other guests at the party observed this confrontation and recorded the interaction on their cellular phones.  Although Iza and Faiq had limited communications with each other prior to August 13, 2024, Telegram and phone records show that Iza and Faiq communicated on August 13, 2024 (Iza's birthday), and

August 14, 2024.  Prior to Schwab booking the airline tickets to fly Faiq to Connecticut to do

Schwab's dirty work, Iza tried to convince his brother to reconsider his decision.  However,

Faiq remained resolute in his decision.  Once Faiq committed to the robbery plot, Iza joined

the conspiracy to manage logistics and more importantly, to minimize his brother's risk

because he did not trust Schwab.  As noted in the affidavit, Source of Information #2

(believed to be [            ]) stated that while driving to the airport in Florida, Schwab

called him and told him not to get on the flight because he did not want to see [   ] go to jail.

This suggests Schwab recognized the inherent risk that Faiq faced, but he did not share this

concern with Faiq like he did with [   ], his long-time friend and confidant.  This is exactly

why Iza joined the conspiracy, to protect his younger brother.

To further the conspiracy, Schwab bought airline tickets for Faiq and the other

member of the St. Louis crew using stolen credit cards.  He also rented an Airbnb with the

same card and procured a rental van and a passenger vehicle for the project.  Because

Schwab didn't know Faiq or the St. Louis crew he recruited too well, he sent one of his

associates from Florida, Angel Borrero, to Connecticut to report back to him the progress of

the robbery.  During the period of August 21, 2024 through August 23, 2024, the St. Louis

group didn't appear to be well organized; they surveilled the wrong house and never located

Chetal.[2]  Messages between Iza (using the moniker or user ID 'Kusha') and the St. Louis

crew confirm that Iza tried to segregate Faiq from the others.  Over the course of the time

frame that Faiq was in Connecticut, Iza and he communicated frequently.[3] After several days

of failing to locate Chetal, the St. Louis conspirators felt it was too dangerous to proceed, and

---

[2]  Apparently, the incorrect address of Chetal's residence was relayed to the St. Louis group.
[3]  Aside from the communications that occurred on August 13, 2024 and August 14th, Faiq
and Iza also communicated with each other on August 19th, 20th, 21st, 22nd and 23rd.

they were also concerned that they were taking more risks than Faiq, who Iza had arranged to be in a getaway car, far removed from the conduct that the St. Louis group was engaged in. In a communication sent by Iza (user ID 'Kusha") to one of the members of the St. Louis group he messaged, "go easy on young [Faiq] hes just a kid". (See PSR at ¶ 50). Ultimately, the St. Louis group decided they were going to abort the plan and return to Missouri. (See **Exhibit B** – (Text communication between Iza (user ID. "Kusha") and Joe Joe). Informed of the decision, Iza purchased their return tickets home. (See **Exhibit C**). Once Faiq was on a flight out of Connecticut, Iza ended his involvement in the conspiracy, too. (See **Exhibit B**). The next communication between Iza and Faiq occurred on September 19, 2024 when Faiq expressed concerns to his brother about getting charged for the robbery attempt.

    5.  Schwab's Association with Cameron Cureton

James Schwab was associated with many unsavory characters who were involved in committing fraudulent online schemes and thefts from well-known holders of large sums of cryptocurrency. One of those shady individuals was Cam Cureton. (See **Exhibit D**). He is a young, white male who resided in Laguna Beach, California and had a history of engaging in nefarious social engineering schemes to defraud others of their property. He also had a connection to a rogue law enforcement officer. (See **Exhibit E**). One victim filed a criminal complaint against him on or about June 27, 2024, a few months before the kidnapping. The victim claimed he was swindled by a younger white male which resulted in the theft of his cryptocurrency holdings for a reported loss of $291,623.75. (See **Exhibit F**). The photo of the person the victim identified as being responsible for the theft very closely resembled Cam Cureton. (See **Exhibit D**). What is noteworthy is that Cam used the online alias 'CX' (See **Exhibit G**). At one point, Schwab and Cam resided together in stately mansions in Miami,

8

Florida and Los Angeles that Schwab had rented. They also flew together on a private jet to/from Los Angeles to Miami prior to the July 2024 nightclub incident. (See **Exhibit H**).

6. The Kidnapping Plot with the Florida Group

After the failed attempt with the St. Louis group, Schwab remained intent on robbing Chetal of his Bitcoin and enlisted a new crew from Florida, affiliated with Angel Borrero, who was still in Connecticut. Schwab and his associates, Cam Cureton, shifted to a kidnapping plan, to seize Chetal's parents and use them as leverage to obtain the stolen crypto. Schwab paid for the Florida group's travel and lodging while Cam stayed in contact with Borrero and Diaz throughout the scheme as the crew surveilled the parents' home.

On August 25, 2024, Sushil and Radhika Chetal were driving a Lamborghini SUV when a car rented by the Florida crew rear-ended them. A white van then boxed them in, and several men surrounded the vehicle, pulled the couple out, and forced them into the van. According to Sushil, he was beaten with a baseball bat and Radhika was dragged by her hair, and both were bound with duct tape before the van sped off. A witness called police, officers quickly located the van, and a chase ensued. After the van crashed, four men fled on foot but were apprehended shortly thereafter; two others were later found at a nearby house that Schwab had rented. The Chetals were taken to a hospital for their alleged injuries and released. The government would later assert at Schwab's detention hearing that Schwab hired the individuals charged in the Borrero matter to kidnap the victims so that Schwab could "extort millions in cryptocurrency and assets" from the victims' son (Chetal) and that his involvement appears to be a 'but for' cause of the Miami crew coming to Connecticut to commit the kidnapping. Based on the government's assertion, there are no facts to suggest

that the Miami crew would have come to Connecticut or carry out the kidnapping independently, without Schwab engaging them and funding this enterprise.

7. Fallout from the Case

All six Florida defendants have pleaded guilty in the kidnapping case. Two have received 11-year prison sentences; the remaining four await sentencing. Veer Chetal has also pleaded guilty for his role in the roughly $245 million Bitcoin theft and agreed to testify against his co-defendants. However, while on bond in that matter and cooperating with federal authorities, he committed another scam and was charged with a new offense. He is now in federal custody awaiting sentencing for the offenses.

8. Investigation of Cameron Cureton

On October 15, 2024, Federal Bureau of Investigation case agent, (SA) Matthew Loucks, conducted a query of the Internet Crime Complaint Center for the terms "CAM" and "CX", names and identifiers believed were associated with the unidentified collaborator, abettor, and co-conspirator of Schwab. (See **Exhibit D**). During the investigation of 'CAM' and 'CX' Special Agent Loucks uncovered a complaint that had been filed against Cam Cureton in June of 2024, and further discovered Cam's association with Schwab. However, law enforcement's investigation of Cam seemed to stall, and they never followed up further with him or his possible involvement in the kidnapping of Veer Chetal's parents on August 25, 2024 once Iza was targeted as Schwab's co-conspirator. This failure to investigate Cam is perplexing considering his name is the very alias that Diaz and Borrero communicated with throughout the conspiracy, *to wit*, 'CAM', among the other ominous connections between him and Schwab.

10

9.  Compare Adam Iza's Association with Cam Cureton

Adam Iza was friends with two of Schwab's roommates and collaborated with them in the FaceBook scheme.  (See PSR at ¶12).  The PSR offense conduct, which is primarily derived from the government's assertions, mentions only one of the roommates but fails to mention the other, namely, Cam Cureton (a.k.a. 'CX').  Iza and Cam communicated frequently concerning the fraudulent FaceBook credit line scheme, dating back to February 21, 2024.  (See **Exhibit I**).  In his communications with Iza, it appears Cam used the same Telegram account ('6561470120') that coincidentally later also communicated with the kidnappers under the user ID 'C'.

10. Definitive Evidence of Cam Cureton's Involvement in the Kidnapping Plot

The evidence establishes that Cam Cureton was physically present during Schwab's Miami nightclub altercation with Chetal and flew with Schwab on the private plane from Los Angeles to Miami and back again.  (See **Exhibit H**).  Furthermore, during the course of the August 25, 2024 kidnapping, and in the days leading up to the crime, two of the Florida participants that Schwab recruited, namely Diaz and Borrero, communicated with Schwab's associate, identified as 'CAM', who also used the Telegram display identifier "C".  Co-defendants Borrero and Diaz communicated with 'C' and 'CAM' throughout the kidnapping scheme.  The government believes "Cam" and 'C' are one in the same – none other than Adam Iza.  But the government's evidence establishes that Diaz and Borrero never met "Cam" or "C" and cannot identify this individual as Iza.  Moreover, Source of Information #2, (believed to be ▮▮▮), provided a statement to law enforcement that the person whom he communicated with as 'CAM' sounded like a "**white male, possibly in his teens or twenties, with a lisp.**".  (See **Exhibit J** (filed under seal)).  This linguistic evidence clearly

corresponds with Cam Cureton, not Adam Iza (who is middle eastern and speaks with a distinct foreign accent).

To support its claim that Iza is "Cam" and "C" the government relies heavily on evidence extracted from Schwab's Apple iCloud account that showed a saved contact with the Telegram display name 'C' as 'Adam Zort'.  (See **Exhibit K**).  What's noteworthy is that this entry in Schwab's account was made on August 31, 2024, six (6) days after the kidnapping.  Since July of 2022 Schwab had Iza saved as a contact on his phone under 'Adam Hitler' along with his personal cell number.  (See **Exhibit L**).  So why did Schwab suddenly create a new secondary contact for Iza – six days after the kidnapping?  The simple answer is that Schwab tried to distance himself from the kidnapping after the botched crime by encrypting his iCloud account, getting a new phone, and telling multiple people that Iza was the catalyst behind the kidnapping.  A message on Iza's phone showed that an associate of his texted him that 'CX's' group was spreading rumors that Iza was behind the kidnapping.  (See **Exhibit M**).

Another noteworthy piece of evidence is that this secondary contact, linking Iza to the 'C' Telegram, is the only incriminating evidence that investigators were able to retrieve from Schwab's iCloud account after he encrypted the account and disposed of the device that he used during the conspiracy.  It is striking that an individual as sophisticated as Schwab, who took extensive measures to conceal his involvement in the kidnapping, including disposing of devices, disassociating from Borrero and Diaz (as mentioned in their respective prison calls), and encrypting his iCloud account in anticipation of a search warrant, would, at the same time, leave behind the sole piece of evidence later recovered from that account, an item that

ultimately points to Adam Iza.[4]  The defense also believes Schwab was trying to protect his friend and associate, Cam Cureton, from being identified in the crime.

Another curious fact is that upon inspecting Iza' phone, the 'C' Telegram was <u>not</u> found on his device.  Instead, the evidence showed that Iza had had communications with that Telegram account, ('6561470120'), dating back to February of 2024, totaling over 740 messages.  (See **Exhibit I**).  Essentially, the Telegram account that the government claims belonged to Iza and controlled by him communicated with 'C' many months <u>before</u> the kidnapping.  If Iza was 'CAM' or 'C", then how does one explain the communication between 'C' and himself – six months <u>before</u> the kidnapping?  This evidence strongly suggests that Adam Iza is not 'C' or 'CAM', but someone else.  One can draw a reasonable inference that Cam Cureton, (known to use 'CX'), used the "C" moniker/identifier to hide his true identity and advance his scheme to defraud others.

11. <u>Why Adam Iza was NOT Involved in the Kidnapping</u>

The government investigators shifted their focus on Adam Iza once they obtained a search warrant for Schwab's iCloud account and discovered a contact on his phone for Iza with the identifier 'C'.  Investigators then reviewed Iza's Apple iCloud account and performed a keyword search for ('6561470120'), the Telegram user ID associated with the Telegram user/display name 'C'.  (See **Exhibit N**).  The problem presented to the government is that none of the communications between Diaz and Borrero with 'CAM' or 'C' were embedded on Iza's phone.  Despite efforts by law enforcement to subpoena

---

[4] The affidavit filed by S.A. Loucks noted in paragraph 61, "I am aware that Schwab encrypted data on his iCloud account, consistent with information provided to investigators. I obtained a search warrant for the contents of Schwab's iCloud account and found that a large amount of data has been encrypted.  I believe Schwab encrypted his iCloud account to keep law enforcement from locating evidence of his involvement in the subject offenses."

Telegram records and establish a definitive link between Diaz, Borrero and Iza during the course of the conspiracy, they were unable to do so. The subpoena for the Telegram account produced a phone number attached to the 'C' account that was not associated with Iza and failed to locate any IP address or login history. The causal connection between Iza, Borrero and Diaz simply does not exist.

On the other hand, law enforcement failed to secure the cellphone belonging to Cam Cureton, which may have provided evidence of his complicity in the offense. Alternatively, the communications that Iza had with the St. Louis group (using the identifier 'Kusha') were all shown on his device with no attempt to conceal or destroy the evidence from the date the group arrived in Connecticut until his arrest in September of 2024. The Telegram account that Iza used to communicate with them using the identifier 'Kusha", including all the messages, was not encrypted and readily available on his device. It begs the question: If Iza wanted to evade detection, why would he have deleted the 'C' communications with Borrero and Diaz, but not delete all the screenshots and communications involving 'Kusha'? The simple answer is that Iza is not 'C'.

Furthermore, upon information and belief, sometime in 2025 Cam Cureton fled the United States and traveled to Dubai. At some point he was arrested on drug trafficking charges where he currently remains detained. Prior to his international arrest, Cam also had connections with a rogue LA police officer while living in California. (See **Exhibit E**). Although considered hearsay evidence, the investigative journalist, ZachXBT, who is responsible for breaking the $245 Bitcoin heist that led to Veer Chetal's arrest, made a post on his twitter page stating that Cameron was involved in "violent robberies". (See **Exhibit O**).

14

To summarize, the government claims that the 'C' Telegram account belonged to Iza and that he operated/authored the chats w/ Borrero and Diaz using the identifiers 'CAM' and 'C', at the same time that Iza was communicating with the St. Louis group as "Kusha" from a different telegram account. Why would Iza use two different identifiers? The government's evidence to establish that Iza is 'Cam and 'C' consists of the following:

1. James Schwab saved the unique user ID of the "C" Telegram account under 'Adam Zort'- 6 days after the kidnapping offense.

2. A **screen shot** of a portion of the chat between Diaz & 'C', which was found on Iza's phone.

3. An Apple-generated InteractionC artifact on Iza's device containing metadata associated with Diaz's StrikerWorld account.

4. The 'C' account had a chat with Borrero which referenced that 'C' "lived in a mansion" and had "police officers who worked for him" when Borrero proposed they meet in person.

While this evidence may amount to circumstantial evidence that Iza was involved in the kidnapping, it also lacks the foundational elements for authenticity as compared to the 'Kusha' evidence which was located on Iza's phone. The 'Kusha' evidence linked Iza directly to the St. Louis conspiracy. But the evidence produced from the Telegram subpoena failed to show that the IP address attached to the 'C' account ('6561470120') belonged to Iza. Without the 'C' account being found on any of Iza's devices[5], and with no IP address, email address or phone number linking him to 'C', the government's claims appear to be purely speculative.

---

[5] Law enforcement searched multiple phones/devices belonging to Iza.

As to the screenshot of the Diaz chat on Iza's phone under 'Striker World', all it establishes is that Iza was sent a screenshot to view a portion of the conversation. (See **Exhibit P**). What it does not prove is that Iza owned the Telegram account or that he sent the messages. Moreover, Iza also received screenshots of photos and text communications with the Airbnb landlord and airline confirmation. (See PSR at ¶30). It's not unreasonable that he also received a screenshot of a portion of the chats between 'C' and Diaz since Iza was involved in the earlier robbery attempt. Alternatively, if Iza was 'C', then why would he even need a screenshot of the communication. He would have had it already embedded on his phone/device.

The most technical piece of evidence the government claims points to Iza's involvement, and also the most confusing, is the Apple-generated InteractionC artifact on Iza's device which contains metadata associated with Diaz's 'StrikerWorld' Telegram account. However, a problem arises because the overall incoming/outgoing interaction pattern on Iza's device does not correspond with the actual incoming/outgoing pattern on Diaz's phone. (See **Exhibit Q-1 & Q-2**). The key issue with this evidence is that there are two identical 'Striker World' Telegram accounts on Iza's device with 2 different Identifiers/User ID's (#'s '36578725405' and 'tg6513954333'). (Id.). But the metadata does not specify which Telegram account on Iza's phone created the logs. This means we don't know which account generated the contacts and whether it was even tied to the alleged 'C' account. The government simply assumes it must have derived from the 'C' account. The other issue is the split activity involving incoming/outgoing messages. One account, named 'Striker World w/ Identifier '36578725405', had 111 incoming messages sent to his device but zero outgoing messages. (See **Exhibit Q-1**). The other 'Striker World' account (w/

16

Identifier 'tg6513954333') had only 13 outgoing messages and zero incoming messages. (See **Exhibit Q-2**).  We know from the government's evidence that Diaz had only <u>one</u> 'Striker World' account on his phone, and that 'CAM'/'C' and 'Striker World' had communications totaling 400 plus messages from both sides.  The incoming and outgoing pattern on Iza's device is inconsistent with the actual communications that Diaz had with 'CAM'/'C'.  The interaction counts do not correspond.  This is not a minor issue.  The government is asking the Court to overlook this inconsistency and focus on the mere fact that Iza's device had some interaction-related association with Diaz.  However, the defense is asking the Court to distinguish what the forensic evidence actually establishes from what the government infers from it.  The actual evidence is that Iza's device contained InteractionC metadata associated with Diaz's Telegram identifier ('StrikerWorld').  If the Court were to rely on the technical data from the government, it suggests there are <u>two</u> 'Striker World' accounts communicating with Iza's device, where one account was only sending messages while the other account was only receiving messages from a Telegram on Iza's phone.  This evidence simply does not correlate with the Diaz/'CAM/'C' communications.  If Iza owned the 'C' account, the data from his device would be clear and consistent with the Diaz chats found on his device.  The split entries and mismatched logs on Iza's device are inconsistent with a clean, authenticated dialogue one would expect if Iza was 'C'.  The metadata does not even identify which account produced the logs and cannot reliably be tied to the 'C' account.  Inferring authorship from this ambiguous and inconsistent record amounts to pure speculation.  The defense is asking the Court to give this evidence only the significance that has actually been established.

17

Addressing the government's evidence which references the chat between Borrero and 'C' where 'C' references "living in a mansion and having police working for him, the government assumes that Iza is the only crypto-player who lives in a mansion and has police contacts.  However, the evidence shows that Cam Cureton, who is an associate of Schwab, as well as associated with the group involved in the Washington DC indictment, also lived in a mansion in Beverly Hills where the rent was $36,900/month, and he was arrested in Dubai with two of the named conspirators in the Washington DC indictment.  (See **Exhibit G**).  And according to the Washington DC indictment, at page 11, members of the enterprise obtained information from off duty law enforcement officers regarding investigations of the enterprise.  (See **Exhibits A**).

Finally, if Iza really wanted to carry out the Chetal robbery plot to completion, the St. Louis group was prepared to stay and finish the job.  They just didn't want Borrerro, someone they didn't know, involved.  (See **Exhibit B**).  As the message between Joe Joe and Iza (user identifier 'Kusha") suggests, the St. Louis group felt they could have completed the job without Borrero's interference.  Joe Joe's message to Iza stated, in part, "if you need us we locked in n ready but no extra ppl we get shi done our selves." (Id.).  All Iza would have had to do was ask them to stay and complete the assignment, which he did not do.  Instead, Iza paid for their flights back to St. Louis and ended his involvement.

For all of the foregoing reasons, *supra*, Adam Iza respectfully submits the government has failed to establish by a preponderance of the evidence that he was involved in the kidnapping events of August 25, 2024.  Rather, the record supports holding him accountable only for the attempted robbery of Veer Chetal.  The government's assertion that Iza participated in the kidnapping rests not on concrete, traceable evidence, such as an IP

18

address, phone number, or email account linked to him, but instead on speculation and layered assumptions. Such conjecture falls short of the evidentiary standard required to attribute Iza's involvement in the more serious conduct alleged.

12. The Sentencing Enhancements Proposed in the PSR Should Not Apply

The central dispute in this case is not the base offense level, but the government's attempt to attribute to Mr. Iza a series of enhancements arising from conduct in which he did not participate, namely, the August 25, 2024 kidnapping. Those enhancements, which include 1) *use of a dangerous weapon* (§2B3.1(b)(2)(D)); 2) *serious bodily injury suffered by a victim* (§2B3.1(b)(3)); 3) *abduction* (§2B3.1(b)(4)(A)); 4) *carjacking* (§2B3.1(b)(5)), and 5) *an aggravated role* (§3B1.1(a)), dramatically increases the advisory range. Their application depends entirely on whether that conduct is properly attributable to Mr. Iza under U.S.S.G. §1B1.3.

It is the defendant's position that the enhancements do not apply. Mr. Iza's conduct in the conspiracy ended once the St. Louis group departed Connecticut and returned to Missouri. During his involvement in the robbery conspiracy, there were no dangerous weapons used or displayed because the robbery never materialized. Moreover, no member of the Chetal family was injured, abducted, or carjacked. Furthermore, the evidence in this case establishes that James Schwab was the leader/organizer of both conspiracies; the St. Louis group's failed robbery attempt, as well as the Florida groups kidnapping offense. He had the motive to retaliate against Veer Chetal after the early July 2024 nightclub incident. The individual who is identified as 'C' is not Adam Iza, but one of Schwab's associates, known as Cam Cureton. The role that Iza (user/display name 'Kusha') played

in the robbery conspiracy with the St. Louis crew does not rise to the level of a leadership role to trigger the enhancement.

Under §1B1.3(a)(1)(B), a defendant is accountable for the acts of others only if those acts were (1) within the scope of the jointly undertaken criminal activity, (2) in furtherance of that activity, and (3) reasonably foreseeable. See United States v. Studley, 47 F.3d 569, 574 (2d Cir. 1995). Each requirement is independent and must be established by a preponderance of the evidence. Critically, the scope of "jointly undertaken activity" is not synonymous with the scope of the conspiracy itself. Id. at 574–75.

Here, the record supports, at most, that Mr. Iza agreed to assist in a planned robbery involving the St. Louis group between August 21 and August 23, 2024. However, that effort failed. The participants abandoned the plan and left Connecticut. At that point, the jointly undertaken activity to which Mr. Iza had agreed ended.

The subsequent kidnapping was not a continuation of that plan. It was a materially different and escalated criminal scheme: different participants (a Florida-based crew), different methods (violent abduction of third parties), and different objectives (leveraging family members rather than confronting the intended target). Courts routinely reject attempts to attribute such escalated conduct where it falls outside the scope of the defendant's agreement. See, e.g., United States v. Getto, 729 F.3d 221, 234 (2d Cir. 2013) (limiting relevant conduct to agreed-upon scope, not broader conspiracy acts).

Nor was the kidnapping reasonably foreseeable to Mr. Iza. The record reflects that even the initial robbery attempt was disorganized and ultimately abandoned due to perceived risk. Nothing in the communications or conduct attributed to Mr. Iza suggests awareness of, agreement to, or anticipation of a subsequent violent kidnapping involving the victims'

20

parents.  Foreseeability cannot be established through hindsight or by reference to the actions of more culpable co-conspirators. See United States v. Johnson, 378 F.3d 230, 238 (2d Cir. 2004).

Because the kidnapping falls outside the scope of Mr. Iza's jointly undertaken activity and was not reasonably foreseeable to him, the enhancements tied to that conduct cannot be applied.  A guideline calculation that includes them would improperly transform Mr. Iza's limited involvement in a failed robbery into responsibility for a violent crime he neither planned nor joined.  Accordingly, the Court should calculate the advisory range without those enhancements. At a minimum, the significant dispute surrounding relevant conduct provides an independent basis for a downward variance.

13. A 3-Level Downward Adjustment Applies Pursuant to U.S.S.G §2X1.1

Section 2X1.1(b) of the United States Sentencing Guidelines refers to the general guideline for "Conspiracy" offenses.  Here, the defendant is convicted of Conspiracy to Commit Hobbs Act Robbery.  Section 2X1.1(b) provides that a conspiracy, decreases by 3 levels, unless the defendant or a co-conspirator completed all the acts the conspirators believed necessary on their part for the successful completion of the substantive offense or the circumstances demonstrate that the conspirators were about to complete all such acts but for apprehension or interruption by some similar event beyond their control.  The defendant submits his conduct in the conspiracy concluded when the St. Louis group abandoned their attempt to rob Veer Chetal.  The decision to withdraw or abandon the conspiracy was not initiated by police intervention.  Rather, members of the St. Louis group were concerned that their identities may have been captured on Ring cameras when they knocked on doors

looking for Chetal. They were concerned that they were taking too great of a risk and decided to leave Connecticut and return to Missouri. (See PSR at ¶¶50-51).

The reality is that the robbery attempt was doomed to fail because the St. Louis group had the wrong address of the victim. They were unable to locate the victim because they surveilled the wrong residence, yielding negative results. The mistakes were completely within the conspirators' control. Under these circumstances, the St. Louis group was never going to complete the substantive offense with which they are charged. This fact pattern is distinguished from United States v Medina, 74 F.3d 413 (2d Cir. 1996) where the circumstances indicated that the conspirators were about to complete all of the acts believed necessary for the substantive offense but for the facts that the police were monitoring them and one of the participants was a confidential informant. What matters under the guidelines is whether the defendant and his co-conspirators were about to complete the crime, not whether they were about to succeed. see also; United States v. Egemonye, 62 F.3d 425, 429 (1st Cir. 1995) ("Effectively, [§ 2X1.1] gives the defendant a three-level discount if he is some distance from completing the substantive crime."); United States v. Sung, 51 F.3d 92, 95-96 (7th Cir. 1995) (holding that whether § 2X1.1 applies "depends on how close the defendant came to completing [the] crimes").

### III. CONSIDERATON OF THE STATUTORY FACTORS UNDER 18 U.S.C. 3553(a) SUPPORT A SENTENCE OF 24 MONTHS

The sentence imposed on Mr. Iza must serve the four recognized purposes of sentencing – just punishment, deterrence, protection of the public, and rehabilitation. See Dean v. United States, 137 S. Ct. 1170, 1175 (2017); see also Gall v. United States, 552 U.S. 38, 50 (2007). In selecting a sentence that best achieves these objectives, the Court must consider the factors listed in 18 U.S.C. § 3553(a)(1) - (7). The Supreme Court has

emphasized that sentencing requires a focus on the individual offender and the unique circumstances of the case, not solely on the offense: "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.  Underlying this tradition is the principle that the punishment should fit the offender and not merely the crime." Pepper v. United States, 562 U.S. 476, 487–88 (2011).

Adam Iza is an intelligent, 25 year old, self-taught entrepreneur with no prior criminal history.[6]  Unfortunately, through his association with the crypto underworld, he got himself involved in a conspiracy to steal crypto currency from Veer Chetal who had stolen it from a Washington, D.C. resident in an elaborate online scam.  This began a chain of events which resulted in two failed attempts by two different groups to procure the money.  Adam Iza admits his involvement in the robbery attempt that occurred between August 21, 2024 and August 23, 2024, but he denies any complicity in the actual kidnaping of Chetal's parents.

In fashioning an individualized and just sentence, 18 U.S.C. § 3553(a) requires the Court to weigh the defendant's history and characteristics, the nature of the offense, and any mitigating circumstances that might support a variance or non-guideline sentence. Here, several factors materially mitigate the need for a lengthy custodial sentence; (1) tragic upbringing that clearly impacted defendant's development into adulthood; (2) his relative lack of prior history; (3) the defendant's lesser role in comparison to the coconspirators.

---

[6] The defendant has been convicted of various federal offenses out of the Central District of California and is awaiting sentencing, which is scheduled for October 5, 2026.

Considered individually or together, these factors justify a sentence below the advisory range that would still satisfy the purposes of sentencing.

## A.  History and Characteristics of the Defendant

### 1.  Early Challenges of Childhood

Growing up in war-torn Iraq in the early 2000s meant navigating a constantly shifting map of danger.  Days were measured by curfews, power cuts, and the rumble of generators; nights by helicopter rotors and distant blasts.  On the outskirts of Baghdad, Adam lived in a one-bedroom clay-and-mud home without doors, windows, or running water. Water, hauled from far away, was a luxury reserved for cooking and drinking, not bathing.  Food came through ration cards, supplemented by long lines at neighborhood bakeries.  His parents' marriage was arranged, and both sides of the family lived close by.  In that landscape, neighborhoods knit themselves tightly together, sharing fuel, watching one another's children, and clinging to ordinary rituals amid concrete barriers, dust, and fear.

### 2.  Separation from Parents and Survival as an Adolescent

As Adam reached school age, his parents separated.  In the upheaval, Adam and his two siblings were split apart: his father remained in Iraq to raise the baby-girl, Rawand; his mother left for the Netherlands; Saife, two years younger than Adam, went to live with their paternal aunt (a well-off attorney); and Adam was sent to Syria to stay with his maternal uncle, Ahad Dhamad (an 18-year-old whom Adam recalls his family consider the "black sheep").

In Syria, Adam and Ahad lived in a windowless, poorly ventilated underground bunker type room.  Every few hours Adam stepped outside just to breathe fresh air.  Ahad had no parenting skills and did not appreciate the responsibility he had assumed.  Food was

scarce and within weeks, Adam had to fend for himself.  He would gather day-old newspapers and try to sell them on the street.  Most passersby dismissed him, but he harangued them and persisted until someone offered a few coins.  With whatever change he collected, he went to the store to buy small rations to quiet his hunger.

Adam grew emotional recounting to the probation officer a moment from this period: a young man handed him a $100 bill for his efforts but declined the newspaper.  At the time, Adam felt resentment, interpreted the gesture as pity.  However, over time, he came to see it as simple kindness.  He says that memory has stayed with him because later, when he had the financial means, he made a point of tipping service workers (i.e. waiters, doormen, restaurant staff) generously.

Under Ahad's influence, Adam also learned the art of stealing food and necessities from vendors and street merchants.  But Ahad was a bad thief and was often caught, and the consequence was a severe beating, punishment they came to see as the price of avoiding starvation.

Adam was eligible to attend school in Syria, and on days he could make the several-mile roundtrip walk, school felt like a blessing because it meant time away from the bunker and his uncle.  But exhaustion from hustling for food kept him away at times, and when he did attend, he was bullied for his soiled, worn clothing.[7]  Adam was especially drawn to a blonde, high-status classmate he described as the most beautiful girl he had ever seen; wanting to be near her motivated him to go more regularly.  During a fundraiser, students were asked to contribute what they could.  Adam had nothing to give because he was

---

[7] Adam wore the same clothing over many weeks and months until the threads literally separated from the fabric.

destitute.  After recess, the collection went missing, and when the teacher asked who might have taken it, the girl pointed at Adam.  He was devastated.  Not only had he not taken the money, but the one person who inspired him to attend school had accused him.  Adam was so humiliated and hurt that he left school and never returned.

After dropping out, Adam spent his days on the street, refining the skills his uncle had taught him.  He fell in with a group of boys like himself, forming a makeshift gang.  They committed petty thefts and endured frequent beatings for their offenses.  Over time, Adam took pride in his ability to withstand punishment, and, as with any practiced trade, he became more adept at his craft.  Eventually, stealing became a way of life for Adam.

    3.    <u>Abuse Inflicted by the Hands of a Relative</u>

After years with Uncle Ahad, Adam had grown numb to the home's deprivation and his daily hardship.  What eclipsed it, however, was the corporal punishment inflicted by another maternal uncle, who stayed with them for extended periods of time and openly disliked his nephew.  Adam tried to remain on his best behavior when this uncle was around, but as a child he sometimes sparked the man's rage and was beaten, leaving visible wounds on his back and torso.  After one such incident, Adam's father happened to visit, saw the injuries, photographed them, and within days, the family was moved to the United States.  Adam does not know the exact circumstances behind their departure from the Middle East, but he believes the abuse was a catalyst.  Paradoxically, he feels a measure of gratitude toward the uncle whose violence precipitated their escape.

    4.  <u>Coming to America</u>

Adam recalls arriving in New York City for a brief stay before relocating to St. Louis, Missouri.  The family's apartment was considered government housing, called "the projects",

which many would label low-income or "ghetto," but to Adam it felt like a significant improvement over what he had known.  Over the next several years the family moved often, from one project to another, each with modest gains in bedrooms and space.  Adam attended school and worked hard to learn English, but after two years he dropped out and left home at sixteen.  His resentment toward his family lingered because he struggled to forgive them for the emotional and physical abandonment he had endured as a child.

5.  <u>Finding a New Life in California</u>

Like many teenagers, Adam spent hours gaming and chatting with strangers online, where he met Nathan, a man more than twenty years his senior.  They became gaming friends, and Nathan invited him to move west and stay with him and his girlfriend.  Adam took him up on the offer and relocated to Southern California, sleeping on Nathan's couch for several months until he saved enough to rent an apartment in downtown Los Angeles.  There, he met a woman several years older who also had two young children.  At seventeen, Adam became a surrogate father to them, playing with the children, taking them to preschool, and serving as a dependable caregiver.  He also completed online courses and earned his GED in 2018.

6.  <u>Introduction into the Crypto-World</u>

In Iraq, Adam's opportunities were limited, but in the United States prospects were expansive.  Long interested in technology, he immersed himself in research on emerging sectors.  As Bitcoin and other cryptocurrencies entered the mainstream in 2017, he saw room for new business models.  In 2019, he launched Zort.com, a cryptocurrency trading platform that managed investor portfolios and provided risk-management tools to help clients make

more informed trades.  The venture generated millions in sales and established him as a meaningful player in the market.

7.    <u>Where it Went Wrong</u>

After becoming quite successful and getting accustomed to living a lavish lifestyle, Adam found himself lured into the crypto underworld.  Through business dealings and acquaintances he met in this community, he quickly learned it was a cut-throat environment.  His childhood survival instincts kicked in which triggered the aggressive and sometimes ruthless behavior he displayed to maintain his status with his peers.

8.    <u>California Prosecution</u>

On September 23, 2024, Adam Iza was arrested and charged in the Central District of California in connection with an extortion scheme investigated by local, state, and federal authorities dating back to 2021.  While operating a crypto-trading company, prosecutors allege he hired off-duty sheriff's deputies to intimidate and extort people with whom he had personal or business disputes, arranging sham arrests and abuse.  Investigators further allege the deputies misused law-enforcement databases and obtained search warrants under false pretenses to gather information on Iza's targets.  Separately, Iza admitted to stealing more than $37 million by accessing lines of credit tied to Meta (Facebook) Business Manager accounts.  On January 22, 2025 Iza pled guilty to Conspiracy Against Civil Rights, Wire Fraud and Tax Evasion, and he is scheduled to be sentenced on October 5, 2026.

**B.  Protecting the Public From Further Crimes**

In considering the need to protect the public from further crimes of the defendant, this Court must balance Adam Iza's lack of a prior criminal history with the circumstances that caused him to commit this offense.  While it is clear that Iza was involved in a plan to rob

Chetal of his ill-gotten gains, he submits he was not involved in the kidnapping plot. This conduct should fall squarely on James Schwab who had the motive, means and opportunity to commit the offense. Mr. Iza recognizes his poor judgment in getting involved with James Schwab. In his letter to the Court, he attributes his conduct to associating with swindlers who fostered his disregard for the law. (See **Exhibit R**). During the two years that Mr. Iza has been deprived of his liberty, he has undergone a profound transformation. His time in custody has given him the opportunity to reflect deeply on his conduct, recognize the gravity of his actions, and gain a clearer understanding of the significant changes he must make in his life moving forward. (Id.) Counsel submits the Court can make a finding that with proper supervision upon his release, Mr. Iza will not pose a danger to the community.

### C. Just Punishment

The concept of "just punishment" under §3553(a)(2)(A) refers to the need for a defendant's punishment to reflect the gravity of the crime. Here, counsel submits that just punishment can be achieved with a sentence below the advisory guideline range. It goes without saying that attempting to commit a robbery is a serious offense. However, there are mitigating factors, as previously discussed, *supra*, that merit consideration from the Court. Accordingly, the Court can fashion such a sentence and still achieve the goals of just punishment and promoting respect for the law.

### D. Pretrial Jail Credit

Adam Iza has been held in federal custody since September 24, 2024 based on his arrest in the Central District of California for crimes for which he will be sentenced on October 5, 2026. With regard to the instant offense, Iza was indicted on October 28, 2025 by a Connecticut federal grand jury, but not presented in the district until January 9, 2026. He's

been detained since his initial appearance in court. However, his co-defendant, James Schwab, was indicted for the same offense and conduct on or about February 25, 2025. It's unclear why it took the government approximately 8 months to indict Iza, when the U.S. Attorney's office for the District of Connecticut contacted Iza's California lawyer in December of 2024 to propose a plea offer. Accordingly, the defendant is asking the Court to give him pretrial credit the date of his indictment, October 28, 2025. In the alternative, Iza should get credit to February 25, 2025, the date that Schwab was presented in the District of Connecticut.

### E. BOP Recommendation

The defendant is asking the Court to recommend to the Bureau of Prisons that he be designated to a facility in California.

## IV. CONCLUSION

As cited above, this case presents a relatively young man whose culpability cannot be assessed in isolation from the environment that shaped him or the limited scope of his actual conduct, and the markedly more serious actions of others in this conspiracy. Adam Iza does not seek to excuse his conduct. He has accepted responsibility for his role in the attempted robbery that occurred between August 21 and August 23, 2024. The question before the Court is not whether punishment is warranted, but rather, what degree of punishment is sufficient, but not greater than necessary, to achieve the purposes set forth in 18 U.S.C. § 3553(a).

Mr. Iza's background is not offered as mere narrative context but as a legally relevant factor bearing directly on culpability, deterrence, and rehabilitation. He was raised in circumstances marked by instability, neglect, exposure to violence, and a lack of consistent

parental guidance.  Those conditions did not instill criminal intent, but they did shape the decision-making framework he carried into adulthood; one that prioritized immediate problem-solving and loyalty over long-term judgment and legal boundaries.  Courts have repeatedly recognized that such formative conditions diminish moral culpability, particularly for young defendants still developing the capacity for independent, reasoned judgment.

Equally significant is Mr. Iza's conduct relative to the broader conspiracy.  The record establishes two distinct phases: (1) the failed attempted robbery involving the St. Louis group; and (2) the subsequent kidnapping carried out by a separate Florida-based group.  Mr. Iza accepts responsibility for the former, but he submits he does not bear responsibility for the latter.  The evidence demonstrates that his involvement ended once the St. Louis group abandoned the plan and departed Connecticut.  The kidnapping, far more serious in nature and consequence, was conceived, funded, and executed by others, most notably James Schwab and his Florida associates.

The government's effort to attribute the kidnapping to Mr. Iza rests on inference rather than reliable identification. The record instead points to another individual, Cam Cureton, as the person operating under the identifiers "CAM" and "C." The communications evidence, voice descriptions, timing of contact entries, and the existence of direct communications between Mr. Iza and the "C" account in February of 2024 all undermine the conclusion that Mr. Iza was directing or participating in the kidnapping.  At a minimum, this evidentiary ambiguity precludes application of the substantial enhancements tied to that conduct.

A guidelines sentence driven by those enhancements would therefore overstate both the seriousness of Mr. Iza's conduct and his relative culpability.  Such a sentence would fail

31

to reflect the need for proportionality, particularly where co-defendants directly involved in the kidnapping have received or face significantly lower sentences relative to the guideline exposure calculated here.

Mr. Iza is a young man with no prior criminal history, demonstrated intellectual ability, and the capacity for meaningful rehabilitation.  His conduct in this case, while serious, reflects poor judgment and situational decision-making, not entrenched criminality or a pattern of violent behavior.  A lengthy term of incarceration is not necessary to protect the public or to deter future misconduct.  A variance or non-guideline sentence that recognizes his limited role in comparison to the others, his personal history, and acceptance of responsibility would more appropriately satisfy the statutory mandate.

For these reasons, and those set forth below, the Court should impose a sentence that reflects Mr. Iza's actual conduct and individual characteristics, one that is sufficient, but not greater than necessary, to achieve the goals of sentencing.

Respectfully submitted,
The Defendant - Adam Iza


By: */s/ William H. Paetzold*
William H. Paetzold
Paetzold Law Group
2230 Main Street
Glastonbury, CT  06033
Tel. (860) 657-2230
Federal Bar No.: ct10074
bill@paetzoldlawgroup.com

## **CERTIFICATION**

This is to certify that the foregoing was filed electronically on August 13, 2026 to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.

*/s/ William H. Paetzold*
William H. Paetzold